UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| DALE GRIFFIN and MICHAEL GRIFFIN, | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil No. 05-52-B-W |
| | ) | |
| TOWN OF CUTLER *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON MOTION TO AMEND AND
RECOMMENDED DECISION ON MOTION TO DISMISS**

Plaintiffs Dale and Michael Griffin began this lawsuit against the Town of Cutler

in state court with a petition for judicial review brought pursuant to Rule 80B of the

Maine Rules of Civil Procedure and, prior to the defendants' removal of the case to this

court on March 25, 2005, the petition went through two amendments.  The second

amended petition, which caused the defendants to remove the matter to this court,

included allegations in its fifth count that the defendants violated the plaintiffs' civil

rights, including rights afforded them by the federal constitution.  On the date the

defendants removed the case to this court, they also filed a motion to dismiss the second

through sixth counts of the second amended petition and to remand the original Rule 80B

to the state court.  (Docket No. 4.)  Thereafter, and within the timeframe allotted in the

court's scheduling order, the plaintiffs filed a third motion to amend their pleading.

(Docket No. 15.)  The defendants' motion to dismiss and the plaintiffs' motion to amend

were referred to me on June 24, 2005.  I now grant the plaintiffs' motion to amend and recommend that the court grant in part the motion to dismiss.[1]

## PLAINTIFFS' FACTUAL ALLEGATIONS

Plaintiffs Dale Griffin and Michael Griffin are residents of Whiting and Edmunds, Maine, respectively.  They own real estate in Cutler and are taxpayers in that town.  Since April 1, 2004, the plaintiffs have been engaged in the business of lobster fishing. (Proposed Third Am. Pet., ¶ 1)  Since April 1, 2004, it has been the intention of the plaintiffs to moor their boats and to conduct their lobster fishing activities from the harbor at Cutler, Maine, and to utilize moorings, the municipal boat ramp and other public and commercial facilities available to lobster fishermen in Cutler.  The plaintiffs are lobster fishermen holding licenses to fish in that part of eastern Maine designated as Zone A.  Zone A includes the coastal zone off Cutler.  (Id. ¶ 2.)  Cutler Harbor is the outlet of Little River to the Atlantic Ocean and is bounded by town land on two sides and by the Ocean on the third side.  (Id. ¶ 4.)  Defendants John Drouin, Patrick Feeney, Robert A. Cates and Alan Taylor are residents of the Town of Cutler, are engaged in the lobster fishing business and each operates his business from Cutler Harbor.  (Id. ¶ 5.) From January 1, 2004, and continuing, Patrick Feeney and Robert Cates have been the duly appointed and acting Harbor Masters of the Town of Cutler.  From January 1, 2004, through approximately April 19, 2005, John Drouin served as a third duly appointed and acting Harbor Master of the Town of Cutler.[2]  (Id. ¶ 6.)  Cutler regulates the Harbor by means of the Cutler Harbor Ordinance.  (Id. ¶ 7.)  Cutler's authority to regulate the

---

[1] In the future, the plaintiffs should place on their filings the docket number assigned by this court, CV-05-52-B-W, rather than the docket number assigned in the state court prior to removal.

[2] On or about April 19, 2005, Nicolas Lemieux was appointed a Harbor Master of the Town of Cutler to succeed Drouin and Lemieux has remained in that position to at least the date of the third amended petition.  Lemieux is not named as a defendant.

Harbor is derived from the Maine Harbor Masters Act, 38 M.R.S.A. §§ 1-13.  It is the stated position of the Town that the number of moorings available in Maine harbors to non-residents may be restricted to an amount equal to 10% of the moorings permitted to municipal residents for commercial and recreational boats and that any nonresident applicants in excess of that number are to be placed on a waiting list.  (Id. ¶ 25.)  Cutler Harbor now contains about 42 occupied moorings suitable for boats, including about 38 resident commercial fishermen and four non-residents of whom two are lobster fishermen.  (Id. ¶ 28.)  According to the plaintiffs, other Maine harbors of comparable size accommodate as many as 800 boats.  (Id. ¶ 18.)  At no time have the Cutler Harbor Masters ever determined the mooring capacity of the harbor. (Id. ¶ 27.)  The Cutler Harbor Masters acknowledge that the Harbor capacity is much greater than 42 boats presently permitted.  (Id. ¶ 29.)  The Town and its harbor masters do not consider the Harbor's mooring capacity when determining the number of moorings they will permit. (Id. ¶ 30.)  The Town of Cutler has never adopted any map or chart establishing navigation channels in the Harbor for passage of vessels, nor has it otherwise established such navigation channels.  (Id. ¶ 19.)  No individual has made any claim to the Cutler Harbor Masters since January 1, 2004, that his or her mooring rights are or have been threatened or invaded by the plaintiffs or by anyone else and no request for protection had been made to the Harbor Masters in this regard.  (Id. ¶ 22.)  Although the Town claims that it is within the Town's discretion to allow more moorings for non-residents, the Town and the Harbor Masters have determined that they will hold the number of non-resident moorings at 10% of the number of mooring permits issued to residents at any given time.  (Id. ¶ 31.)

On April 21, 2004, the plaintiffs, Dale and Michael Griffin, applied to the Harbor Masters of the Town of Cutler for permission to maintain commercial moorings in Cutler Harbor.  (Id. ¶ 35.)  On May 3, 2004, the Harbor Masters denied the applications.  (Id. ¶ 36.)  On May 13, 2004, the Town of Cutler gave written notice to each of the Griffins that their applications had been denied on the grounds that all non-resident mooring spaces were already allocated and no additional permits would be issued to non-residents. The Harbor Masters stated as follows in their denial letters:

> Your application for a mooring in Cutler Harbor has been denied. The reason for this is found under M.R.S. Title 38, Chapter 1, sub-section 1, section 7-a, paragraph 2, which deals with allocation of non-resident moorings.  Your name has been placed on a waiting list.  You will be notified when a mooring space becomes available.  In order to maintain your name on a mailing list, you are required to re-apply for a mooring on an annual basis.  You must re-submit by April 1st of each year.

(Id. ¶ 37.)  The plaintiffs assert that there were approximately 60 mooring spaces in Cutler Harbor available for permitted use as of May 13, 2004, and that ample room existed in the harbor to safely locate the moorings requested by plaintiffs.  (Id. ¶ 38.)

In April 2004, the plaintiffs developed a business relationship with Stillman Fitzhenry involving the use of Mr. Fitzhenry's pier to supply their boats, purchase and load bait, and to off-load and sell their catch.  According to the Griffins, in May 2004 certain resident lobster fishermen then doing business with Mr. Fitzhenry (including at least one Harbor Master), acting in concert with the Harbor Masters, told Mr. Fitzhenry that they would all cease doing business with him unless he ceased doing business with the plaintiffs. As a consequence, Mr. Fitzhenry stopped doing business with the plaintiffs and told them to cease using his pier.  Having been denied moorings in the Harbor and being frustrated in their attempt to utilize the only commercial pier in the Harbor, the

plaintiffs began launching a skiff from the Town's public boat ramp in order to ferry bait, other supplies and their daily catch between the shore and their boats.  (Id. ¶ 80(c), (e).) According to the Griffins, they were the only persons using the boat ramp for this purpose.  (Id. ¶ 80(e).)

About May 3, 2004, Dale Griffin was allowed free use of a permitted mooring space owned by a Cutler resident.  Dale Griffin set his own mooring tackle and used the mooring space in the conduct of his fishing business during the 2004 fishing season.  (Id. ¶¶ 42, 80(b).)  After May 3, 2004, Michael Griffin was also allowed free use of a mooring space held by a resident for rental.  The latter mooring space was permitted by the Army Corps of Engineers for use as a rental mooring location and had been used for that purpose by the resident for a period of years.  Michael Griffin set his own mooring gear at the location and used this mooring in the conduct of his lobster fishing business until an unknown person or persons cut the mooring pennant, setting his skiff adrift, and cut off the mooring ball, causing the mooring tackle to sink to the bottom of the Harbor. After the mooring was cut, a resident let Michael Griffin use his mooring for the remainder of the 2004 season without charge.  (Id. ¶¶ 43, 80(b).)

In June of 2004, the plaintiffs acquired a parcel of shorefront property in Cutler Maine.  The deed describes water frontage on Cutler Harbor well in excess of 100 feet, which, they maintain, entitles them of right to at least one mooring in Cutler Harbor pursuant to sections 3, 7-A and 11(2) of the Harbor Masters Act.  (Id. ¶ 51.)  (Id. ¶ 52.)

By letter dated July 7, 2004, the Town of Cutler directed both Dale and Michael Griffin to remove their boats from the moorings they then occupied.  (Id. ¶ 44.)  In support of this directive, the Cutler Harbor Masters asserted that the Harbor Ordinance

prohibits one from mooring his vessel at another person's mooring and that transferring mooring privileges without harbor master consent is prohibited under 38 M.R.S.A. § 3. (Id. ¶ 45.)  The plaintiffs maintain that their use of existing moorings did not violate the Harbor Masters Act.  (Id. ¶ 46.)  They further contend that the Cutler Harbor Masters observe a regular practice or policy that permits boat owners to use mooring spaces assigned to others provided that such use is temporary and without consideration.  They allege that neither the Town nor its Harbor Masters have adopted any regulation defining what constitutes "temporary" use.  (Id. ¶ 47.)  According to the plaintiffs, the mooring spaces previously allowed by the Harbor Masters for use in prior years by Sterling Fitzhenry as rental moorings had never been permitted through the Town's application process, but it had become a matter of custom and practice for the Town to allow Sterling Fitzhenry to maintain rental moorings for use by customers and others in connection with his wharfing, marina and fish brokerage business.  (Id. ¶ 48.)  They also assert that the mooring locations occupied by the plaintiffs as of July 7, 2004, were in areas customarily used for mooring boats and that their moorings and boats did not give rise to any safety or navigation hazard.  (Id. ¶ 49.)  They elsewhere allege that the directive to depart from moorings assigned to others was premised on an assertion that non-resident fishermen cannot use moorings that are not assigned to them.  (Id. ¶ 80(b).)

On July 7, 2004, the plaintiffs gave the Harbor Masters notice of their refusal to leave the moorings and denied that the existing Ordinance prohibited their arrangement for the use of moorings.  (Id. ¶ 80(b).)  On July 8, 2004, the Town amended its Harbor Ordinance in certain respects.  Among other amendments, the Town added the following provision (Section 5):

> **Prohibited Commercial Activities**: Non-Resident commercial fishing or
> any other commercial use of the Town of Cutler Boat ramp is prohibited,
> excepting for the sole purpose of launching or hauling out a boat.

(Id. ¶ 80(e).)  In addition, the amendment imposed a requirement that non-residents

purchase permits from the Town in order to use the public boat ramp.   (Id. ¶ 8.)  The

plaintiffs did not abide by Section 5 of the Ordinance and they advised the Town that the

restrictions were illegal.  (Id. ¶ 80(e).)  On July 18, 2004, the plaintiffs notified the

Harbor Masters that they had acquired shorefront property and that they were entitled to

two (or at least one) mooring as a matter of statutory right.  (Id. ¶¶ 56-57.)  The "notice"

they speak of is attached to their petition as Exhibit K, a letter from their counsel to the

Harbor Masters stating that the plaintiffs' ownership of shorefront property entitles them

to one mooring and asking that such a mooring be afforded by the Harbor Masters and

located at a suitable location in the harbor.  (Id. ¶ 57 & Ex. K.)  The letter also requests

two moorings in light of the fact that the plaintiffs' parcel has sufficient shore frontage to

be subdivided into two parcels, each having 100 or more feet of shore frontage.  (Id.)

According to the plaintiffs, the Harbor Masters declined to respond in writing to their

request.  (Id. ¶ 57.)  They further allege that the Harbor Masters justified their disregard

for this request because the plaintiffs never submitted new applications for moorings

based on the alleged statutory right.  (Id. ¶ 58.)  Additionally, the plaintiffs assert that the

Harbor Masters have indicated they would not issue any mooring to them based on their

ownership of shorefront property because the plaintiffs do not reside on the property.  (Id.

¶ 59.)  Additionally, they allege that Harbor Master Drouin stated that the Harbor Masters

would not have granted the application in any event because there was not suitable

mooring ground in the flats off the property.[3]  (Id. ¶ 80(f).)  According to the plaintiffs, "under the circumstances presented," the Town had no authority to require them to remove their boats from Cutler Harbor and "the direction for removal [was] void."  (Id. ¶ 53.)

On July 29, 2004, the Harbor Masters caused service of a criminal complaint charging the plaintiffs with the refusal to obey a lawful order of the Harbor Masters, a Class E crime.  (Id. ¶ 80(b).)  The plaintiffs allege that Cutler records contain no instance in which a non-resident voluntarily relinquished a mooring right under circumstances that would allow another non-resident an opportunity to receive a permit.  (Id. ¶ 74.)  They further allege that it is the Town's position that no additional non-resident moorings will issue until the number of resident moorings increases.  (Id. ¶ 75.) There has been virtually no change in the number of resident moorings in years.  (Id. ¶ 76.)

In October 2004, Dale Griffin took up his remaining traps and moved his boat out of Cutler Harbor in response to "harassment" experienced in March through September of that year and to avoid potential vandalism to his boat and the loss of fishing gear at sea by persons cutting his lines. (Id. ¶ 80(h).)

According to the plaintiffs, during the winter of 2004-2005 numerous non-resident draggers and urchin divers used the Harbor to fish in the coastal waters off Cutler.  These non-resident fishermen used the boat ramp, made arrangements to use moorings belonging to others or to set their own moorings in the Harbor in order to conduct these seasonal activities.  The Harbor Masters took no action to enforce the

---

[3]      According to the Griffins, the Harbor Masters' decision was "ratified and confirmed" on April 15, 2005, and that the Harbor Masters have taken the position that § 3 of the Harbor Masters Act should be read to limit moorings as of right only to the area in front of the property and, if that area is unsuitable, the right to a mooring is extinguished.  (Id. ¶ 80(f).)

Ordinance with respect to these non-resident fishermen.  Thus, the plaintiffs assert, it is the policy of the Town to interfere with use of the Harbor by commercial fishermen only when those fishermen are engaged in lobster fishing.  (Id. ¶ 80(i).)

The plaintiffs allege that as the lobster fishing season approached in March 2005, the Harbor Committee and the Harbor Masters took steps to prevent the use of the boat ramp by the plaintiffs under the guise that the Town needed to enforce the payment of boat ramp usage fees.  Thus, the Harbor Committee and the Harbor Masters erected and locked a steel gate blocking the public way for access to the boat ramp.  The Harbor Committee erected a sign stating that a key to the gate would have to be obtained by persons desiring to use the ramp and all non-residents would have to pay a fee.  In addition to collection of fees from non-residents, the Selectmen, the Harbor Committee and the Harbor Masters sought to prevent the Griffins from using the boat ramp to load their traps and gear onto a skiff for transport to their boats, thus preventing the plaintiffs from getting traps to the fishing grounds.  Due to public outcry the locks were removed from the gate on March 29, 2005, and access was restored.  (Id. ¶¶ 80(j), 100.)

In April 2005, the plaintiffs formed a group to buy Fitzhenry's Wharf from Mr. Fitzhenry.  An agreement in principle was reached for the purchase.  The agreed-upon price was $1,000,000 with Mr. and Mrs. Fitzhenry providing a significant amount of owner financing for the purchase.  Upon learning of the possible purchase, certain resident lobster fishermen formed a group to compete for purchase of the property, but they were unsuccessful.  Certain resident lobster fishermen, including at least one Harbor Master then doing business with Mr. Fitzhenry told Mr. Fitzhenry that if he sold his business to the plaintiffs the resident lobster fishermen would take their business

elsewhere with the intention of causing the business to fail and thus jeopardizing the repayment of Mr. Fitzhenry's purchase money financing.  (Id. ¶ 80(k).)

On April 15, 2005, the Harbor Masters denied the plaintiffs' applications for a mooring as shorefront property owners as described above.  The Harbor Masters denied the applications on the grounds that all mooring privileges available to non-residents had been assigned and the plaintiffs remained on the waiting list.  (Id. ¶ 80(l).)  As a result, in or about March 2005, the plaintiffs made arrangements with residents Mark McGuire Jr. and Mark McGuire Sr. for the use of their moorings and attached their boats to the McGuire moorings.  There was no rent, assignment or other transfer of the McGuires' moorings.  On April 15, 2005, the Harbor Masters notified the plaintiffs in writing that the boats attached to the McGuires' moorings were in violation of § 3 of the Harbor Masters Act and regulations contained in the Harbor Ordinance.  Demand was made for immediate removal of the boats from the moorings, backed up with a warning that a suit would be commenced for civil penalties of up to $2,500 per day.  (Id. ¶ 80(m).)  Also on April 15, 2005, the Harbor Masters served written notice upon the McGuires.  In the notice the Harbor Masters informed Mark McGuire Sr. that he was not permitted to attach any boat to his mooring other than the boat specifically permitted to be moored there and that the continued use of his moorings in such fashion would result in a civil action seeking penalties of up to $2,500 per day.  The Harbor Masters gave similar directions to Mark McGuire Jr. and made similar threats of civil penalties.  (Id. ¶ 80(n).)

According to the plaintiffs, Mark McGuire Sr. was a participant in the group formed by the plaintiffs to purchase Fitzhenry's Wharf.  The plaintiffs allege that the Harbor Masters and other fishermen engaged in a pattern of intimidation and harassment

of Mr. McGuire Sr. intended to make an example of any resident providing assistance to a non-resident lobster fisherman.  In addition to the placing of a noose in Mr. McGuire's bait box in 2004 and general verbal harassment, defendant Feeney in the company of other resident lobster fisherman threatened Mr. McGuire in or about March 2005 that his house would be burned.  According to the plaintiffs, Feeney also drove to Mr. McGuire's home with two pick-up trucks filled with resident lobster fishermen and told Mrs. McGuire that "they were looking for Mark."  According to the plaintiffs, these actions so intimidated Mrs. McGuire that the McGuires have placed their house on the market with the intention of moving out of Cutler.  (Id. ¶ 80(o).)

On May 11, 2005, a special town meeting was held in Cutler to consider, and ultimately approve, proposals by the Harbor Committee and the Harbor Masters to adopt several amendments to the Cutler Harbor Ordinance.  For present purposes, those amendments (a) make the setting of unpermitted moorings an unlawful act subject to a civil action against both the person maintaining the unpermitted mooring as well as any person who helps, assists or facilitates the setting and maintenance of the unpermitted mooring; (b) treat the failure to apply for a mooring permit renewal within a 15-day period set annually as abandonment of the mooring and authorization for the Harbor Masters to remove the mooring by sinking or otherwise, whether or not a boat is attached; (c) set annual mooring permit application fees of $10 for residents and $50 for non-residents; make (d) make unlawful the use of any mooring by any person other than the permittee for any purpose, unless a temporary mooring permit is issued by the Harbor Masters upon finding that "extenuating circumstances exist so as to necessitate the temporary use of another's mooring assignment" for a period not to exceed two weeks

and not to be granted more than twice per year; (e) re-affirm that any violation can be the subject of prosecution for a class E crime in addition to civil penalties.  (Id. ¶ 80(p).)  The plaintiffs' frequent references to the 2005 Ordinance concern these amendments.  (Id. ¶ 7, citing Ex. F.)

Cutler Selectman Christian Porter (not a defendant) stated at the May 11, 2005, meeting that the Town's Selectmen, Harbor Committee and Harbor Masters presented and recommended passage of the 2005 Ordinance because earlier versions of the Ordinance were inaccurate, confusing or erroneous.  Porter also asserted, among other things, that the statement of purpose in the existing Ordinance calling for maximization of mooring space in the Harbor needed to be changed to state a purpose to maximize mooring space only for residents of the Town;  that the Ordinance needed to be amended to clearly prohibit the rental of moorings in the Harbor whether for resident or nonresident use; that mooring fees needed to be increased for non-residents from $10 per year to $50 per year; and that language was needed to clarify and strengthen the Harbor Masters' enforcement powers, including the right to prosecute for a civil violation not only ordinance violators, but also persons assisting or facilitating a violation.  (Id. ¶ 9.) According to the plaintiffs, the 2005 Ordinance is intended by the Town Selectmen, Harbor Committee and Harbor Masters to allow the Harbor Masters to gain "control" over the Harbor with sufficient authority to prevent non-resident commercial fishermen from gaining access to the Harbor by obtaining permission to use moorings from cooperative residents who have moorings assigned and permitted to them.  (Id. ¶ 11.) The plaintiffs allege that it has been the consistent position of the Town since April 2004 that Cutler Harbor belongs only to the Town and should be managed as a Town resource

for the benefit of Town residents, to the exclusion of non-residents, including non-resident owners of shorefront property.  (Id. ¶ 12.)

In addition to complaining of the measures taken by the Town and the harbor Masters to frustrate their use of the Harbor for commercial purposes, the plaintiffs allege that the amendments to the Cutler Harbor Ordinance have effectively eliminated the availability of rental moorings at Fitzhenry's Wharf, thus rendering impossible the operation of a boat service facility/marina at Fitzhenry's Wharf or at any other wharf in the Harbor.  They complain that the elimination of the boat service facility at Fitzhenry's Wharf means that no non-resident lobster fisherman can use or even buy the facility to gain access to the Harbor.  (Id.)

Following the special town meeting on May 11, 2005, the plaintiffs concluded that they had been effectively excluded from any access to the Harbor and removed their boats from the Harbor with the intention of fishing the coastal waters off Cutler from Lubec.  (Id. ¶ 80(q).)

## PLAINTIFFS' THEORIES

In addition to challenging the Town of Cutler's actions through the Rule 80B petition, the plaintiffs assert a number of causes of action against the Town and its Harbor Masters, both in their official and private capacities.  According to the plaintiffs, the Town of Cutler and its Harbor Masters have opposed the plaintiffs' efforts to obtain moorings in the Harbor exclusively in order to prevent non-resident fishermen from engaging in lobster fishing in the coastal zone off Cutler Harbor in competition with

fishermen who reside in Cutler, including the Harbor Masters themselves.[4] (Id. ¶¶ 64, 71.)  The plaintiffs allege that the acts of the Town and its Harbor Masters have violated the plaintiffs' rights to equal protection of the law, to procedural and substantive due process, and to engage freely and without unreasonable hindrance in interstate commerce. (Id. ¶ 65.)

As for equal protection, the plaintiffs allege that the Town and the Harbor Masters do not seek to enforce mooring permit violations against recreational boaters, resident fishermen, and non-resident commercial fishermen fishing for species of seafood other than lobsters.  (Id. ¶ 83.)  They allege three incidences in which non-residents with moorings were allowed to let other persons use their moorings without any interference by the Harbor Masters.  (Id. ¶ 84.)  According to the plaintiffs, the Harbor Masters elected on or about July 29, 2004, to selectively commence a criminal action against them for violation of § 13 of the Harbor Masters Act without probable cause to support such action.  (Id. ¶¶ 85-86, 89.)  They also maintain that the Harbor Masters have refused to investigate criminal acts committed in the Harbor, specifically the incident in which an unknown individual cut Michael Griffin's mooring line.  (Id. ¶ 90.)  The plaintiffs also allege "discrimination" with respect to the setting of fees.  They assert that the $20 daily or $50 weekly fee imposed for non-resident use (including use by non-resident property owners) of the Cutler boat ramp has no basis in reason because residents are not required to pay any fee, the fees collected will exceed the cost to maintain the ramp, the fees were based on a "Harbor Committee" estimate of the revenues earned by non-resident lobster fishermen who would use the boat ramp and no fees have ever been charged to any of the

---

[4]       Harbor Master Drouin testified at his deposition on October 18, 2004, that the fishermen of Cutler Harbor have offered to pay the costs of this lawsuit in order to protect the resource from non-residents. (Third Am. Compl. ¶ 73.)

urchin divers and draggers using the ramp during the winter season. (Id. ¶¶ 92-99; see also ¶ 80(d).)  They also maintain that the Town's erection of the locked gate contributes to this theory of relief. (Id. ¶ 100.)

As for due process, the plaintiffs assert that they have "a property right in the issuance of mooring permits granting them mooring privileges in the Harbor." (Id. ¶ 105.)  They describe the permit application process as "a sham insofar as applications by non-resident lobstermen were concerned" and maintain that the process "is and was dominated by the desire of the Harbor Masters to use the process as a means to [exercise] control over the off-shore lobster beds by denying access to competitors through the Harbor to the fishing grounds." (Id. ¶ 107.)  Additionally, they maintain that the Harbor Masters actually concluded that the plaintiffs were entitled to at least one mooring by virtue of their ownership of shorefront property in Cutler but decided to take no action on the grounds that the instant appeal was already pending as of that date. (Id. ¶ 103.)

As for interstate commerce, the plaintiffs assert that the lobster fishing industry conducted in Cutler Harbor is part of and within the zone of interest of interstate commerce because large quantities of lobster are harvested off-shore and sold through local dealers in interstate trade and commerce. (Id. ¶ 78.)  They further allege that they are within the zone of interests of interstate commerce because they sell the lobsters they catch to dealers who re-sell the product in interstate trade. (Id. ¶ 79.)  Finally, they maintain that the fees set for use of the boat ramp were designed specifically for the purpose of making it uneconomical for non-resident lobster fishermen to use the boat ramp in furtherance of their business activities. (Id. ¶ 101.)

The plaintiffs further allege that the acts of Harbor Masters Feeney, Cates and Drouin have amounted to extortion and intimidation, including, without limitation, unlawful threats made under color of state law to cut moorings and set adrift valuable fishing boats, blockage of access to a public boat ramp by means of steel gates and multiple locks, blockage of access to public docks and threats to withhold trade from or to physically harm those individuals doing business with or otherwise assisting the Griffins in their efforts to access the Harbor.  (Id. ¶ 66.)  The plaintiffs also complain of, and appear to seek relief concerning, a pattern of general harassment from resident fishermen including interference with their access to Fitzhenry's wharf and the boat ramp, threats and attempts at intimidation made over radio channels monitored by lobster fishermen in the area.  (Id. ¶ 80(g).)  According to them, in addition to the other events described above, resident lobster fishermen have cut lines attached to traps and gear set by the plaintiffs in the coastal waters off Cutler, causing the plaintiffs a loss of approximately $50,000.  (Id.)

### THE MOTION TO AMEND

The factual allegations set forth above were taken from the proposed third amended complaint.  The current operative pleading is actually the "Second Amended Petition for Review of Governmental Action Pursuant to M.R.Civ.P. Rule 80B and Complaint for Related Relief," which is already the third pleading proffered over the course of the past year, the original petition having been filed in state court on June 10, 2004.  The Second Amended Petition is a twenty-four page, six-count document.  Count one seeks traditional Rule 80B review of the Town's denial of the May 13, 2004, permit application.  Count two is a second petition for review, this time of the July 7, 2004,

directive that the Griffins remove their boat from the "borrowed" mooring.  Count three seeks review of the Harbor Masters' failure to act on the July 18, 2004, application for a mooring after the purchase of shorefront property by the Griffins.  Count four is styled as simply a complaint for injunctive relief against the Town of Cutler.  Count five is a claim for violation of "civil rights" and complains of "discrimination" and "economic protectionism."  Count six is styled as "wrongful interference" and is leveled at the individual defendants.

After the defendants filed a motion to dismiss counts II through VI of that pleading, the plaintiffs responded with a motion to amend, seeking to replace the second amended petition with a new forty-two page document consisting of eight counts.  Counts I, II, and III of the proposed pleading remain essentially the same as counts I-III of the second amended complaint.  Count IV of the proposed pleading is directed solely against the Town of Cutler and claims civil rights violations, whereas the preexisting count IV asserted a "claim" for injunctive relief.  Like count IV, count V of the proposed pleading asserts a civil rights claim against the individual defendants and adds a reference to 42 U.S.C. § 1985, in addition to § 1983.  The allegations supporting both civil rights claims appear to have been expanded to incorporate additional facts, including events that have transpired since the prior petitions were filed.  In addition, the proposed pleadings makes reference to the Equal Protection Clause, the Due Process Clause and the Commerce Clause, whereas the second amended petition made reference to only the Commerce Clause.  Count VI of the proposed third amended petition seeks a declaratory judgment against the Town of Cutler pursuant to 28 U.S.C. § 2201 declaring that the 2005 Ordinance violates both the Maine and United States Constitutions and Maine

statutory law.  Count VII claims wrongful interference by the individual defendants, thus reprising the old count five, but adds a new defendant named Alan Taylor who, according to the plaintiffs, is a Cutler resident and lobster fisherman with a base of operations in Cutler Harbor.[5]  Count VIII charges the individual defendants, including the proposed new defendant Taylor, with violations of Maine's Unfair Trade Practices Act (5 M.R.S.A. § 205-A *et. seq.*).

After a responsive pleading has been served, a party may amend his complaint "only by leave of court or by written consent of the adverse party."  Fed. R. Civ. P. 15(a). Leave to amend "shall be freely given when justice so requires."  Id.  In Foman v. Davis, the Supreme Court instructed:

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits.  In the absence of any apparent or declared reason— such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be "freely given."

371 U.S. 178, 182 (1962).  Although Rule 15(a) does not prescribe a particular time limit for a motion to amend, it is well established that such a motion "should be made as soon as the necessity for altering the pleading becomes apparent."  6A Charles Alan Wright et al., Federal Practice & Procedure § 1488 (2003).

The motion to amend is the first motion to amend submitted in this venue and was filed within the deadline for amendment of pleadings that is set forth in the Court's March 30, 2005, scheduling order.  Because I find that the amendments would not be futile and

---

[5]     According to the third amended petition, Mr. Taylor has knowledge of who cut the plaintiffs' trap lines and mooring pennant, participated in terrorizing the McGuire family, and was the spokesman for a group of fishermen who approached Mr. Fitzhenry and threatened a boycott of his business.  (Third Am. Pet. ¶ 124(b), (d) & (e).)

that the motion to amend is timely and was not submitted for purposes of delay, the motion to amend is granted.

### THE MOTION TO DISMISS

**A.     Counts II and III**

Counts one through three of both the second amended petition and the proposed third amended petition are essentially the same.  The first count, which is not presently challenged for failing to state a claim,[6] seeks review of the May 13, 2004, denial of the Griffins' original applications for mooring permits in Cutler Harbor.  The second count challenges the directives issued to the Griffins by the Harbor Masters to remove their boats from moorings assigned to others.  The third count challenges the Harbor Masters' failure to act upon, or even respond to, the Griffins' letter request that their mooring permit applications be reconsidered in light of their acquisition of shorefront property.  The defendants challenge counts II and III as premature because the Griffins never submitted a new permit application after acquiring the property.  (Mot. to Dismiss at 4-5.)  I conclude that this contention does not support a finding that counts II and III fail to state a claim for which relief may be granted.  The defendants fail to demonstrate any basis for the court to find that the Griffins' preexisting permit application was an inadequate application for them to act on.  In fact, the allegations reflect that the Harbor Masters purportedly placed the Griffins on a permit waiting list, which fact supports an inference that their applications were considered by the Harbor Masters to remain operative pending approval (assuming they were renewed annually by letter).  The issue generated by counts I through III concern the legitimacy of the Town and its Harbor Masters'

---

[6]     Defendants do challenge counts I-III to the extent they are directed at the individual Harbor Masters in addition to the Town of Cutler.  In response, the Griffins agree that these three counts apply only to the Town of Cutler.  (Pls.' Obj. to Mot. to Dismiss at 4, Docket No. 11.).

executive actions in refusing to provide the Griffins with mooring permits and the legislative or quasi-legislative action of crafting allegedly discriminatory regulations. As pleaded, these acts and the failure or refusal to act[7] appear to provide appropriate bases for Rule 80B review because they are allegedly violative of civil rights or unsupported by law and reflect an abuse of power for which judicial review is "otherwise available by law." See, e.g., Sold, Inc. v. Town of Gorham, 2005 ME 24, ¶ 12, 868 A.2d 172, 176 (observing that "governmental action may be challenged at any time . . . when the action itself is beyond the . . . authority of the administrative body to act"); Lyons v. Bd. of Directors of Sch. Admin. Dist. No. 43, 503 A.2d 233, 236 & n.3 (Me. 1986) (concerning common law extraordinary writs of mandamus and prohibition). The defendants' perfunctory arguments for why these claims should be summarily dismissed are not persuasive.

## B.       "Count IV" of the Second Amended Petition

The defendants' motion to dismiss the fourth count of the second amended petition will be rendered moot by the filing of the proposed third amended complaint, which removes the prior claim for injunctive relief and replaces it with a civil rights claim.

## C.       The Civil Rights Claims

The defendants' final challenge concerns the Griffins' civil rights theories. Those theories are restated in counts IV and V of the proposed third amended petition. According to the defendants, the Griffins' civil rights theories are devoid of substance

---

[7]       The defendants also argue that count III is barred because it was not filed within a 30-day limitation period. (Mot. to Dismiss at 6.) However, the limitation set by the Rule with regard to a "failure or refusal to act" is six months after the date on which action should reasonably have occurred. Me. R. Civ. P. 80B(b).

because there is no property interest at stake in this case, because the Griffins are not

members of a suspect category, because the Harbor Masters' acts and refusal to act do not

shock the conscience, and because there are no allegations that the Griffins engage in

interstate commerce.  (Mot. to Dismiss at 7-13.)  I address the civil rights theories in the

order they are discussed by the Griffins.

1.      *Commerce clause*

The defendants' only challenge to the Griffins' commerce clause theory is that the

Griffins have not alleged that they engage in interstate commerce.  (Mot. to Dismiss at

13.)  The third amended petition plainly alleges that the Griffins do sell the lobsters they

harvest in interstate commerce.  Although I am curious about the contours of this theory,[8]

---

[8]      Although I recognize that Maine residents regularly sue other Maine residents for the violation of rights conferred by our federal Constitution, my threshold concern was that the Griffins might not be within the "zone of interest" of the "dormant" Commerce Clause given the fact that they are Maine residents challenging Maine regulation.  However, my independent research suggests that the fact that the plaintiffs are Maine residents is not an obstacle to their claim.  See, e.g., Barker Bros. Waste v. Dyer County Legis. Body, 923 F. Supp. 1042, 1048 n.11 (W. D. Tenn. 1996) (discussing dormant commerce clause claims brought by in-state plaintiffs).  Based on this line of authority, it appears that the defendants' alleged actions in refusing to permit the Griffins to moor or anchor their boats in Cutler Harbor or to utilize on reasonable terms the Town's public boat ramp in furtherance of their lobster fishing trade, based on what is alleged to be a purely protectionist purpose, falls within the zone of interest of the Commerce Clause.  For all intents and purposes, the Griffins are pursuing their federal civil rights claims in their capacity as citizens of the United States.

      Beyond this initial concern, it seemed to me that there must be abundant authority to the effect that a municipality cannot act as the sovereign of navigable coastal waters in order to exclude or unreasonably hinder commercial or other traffic therein.  Although the parties have made precious little effort in their memoranda to explicate this basis for civil rights relief, I have collected some federal court precedent that appears to be relevant to the matter. Hawaiian Navigable Waters Preservation Soc'y v. Hawaii, 823 F. Supp. 766, 775 (D. Haw. 1993) (involving a commerce clause claim concerning alleged rights to access moorings or to anchor in navigable waters and observing that state regulation "is permissible if the state regulates evenhandedly, has a legitimate interest, and the local benefits outweigh the burden on interstate commerce").  I note that the simple act of dropping an anchor or locating a more permanent mooring in a harbor, at one's own expense, is not the same thing as obtaining a service from the Town, as might be the case with respect to use of a public wharf or boat ramp, and therefore the Town is on less stable ground in denying a mooring permit than it would be in demanding a reasonable fee in exchange for access to a municipal wharf or boat ramp.  See, e.g., Packet Co. v. Keokuk, 95 U.S. 80, 84-86 (1877) (addressing a commerce clause claim challenging the fees charged for use of a public wharf and observing that it is "something imposed by virtue of sovereignty" (such as the right to exclude others) that is "prohibited" in these circumstances, not the imposition of reasonable fees).  Many other precedents appear to touch on the controversy presented in this case in different ways.  My impression is that counsel ought to take a more serious look at the various precedent that might apply to this aspect of the case.  Their efforts to date are not sufficient for "dispositive" legal analysis.

the limited objection that the defendants raise is based on an inaccurate characterization of the Griffins' allegations.  Even if there were ambiguity in the second amended petition about the Griffins' participation in interstate commerce, the third amended petition, which I have granted the Griffins leave to file, clearly alleges that the Griffins do participate in interstate commerce.  Accordingly, I recommend that the Court not dismiss the commerce clause aspect of the Griffins' civil rights claims.

      2.    *Equal protection*

The defendants argue that the Griffins fail to state an equal protection claim because they fail to allege that they are members of a suspect class and because the case put forward by the Griffins is simply not deserving of constitutional consideration.  (Mot. to Dismiss at 7-8.)  The Griffins respond that an equal protection claim can be made out here because, among other things, the Town is discriminatorily exercising its regulatory power over Cutler Harbor based on residence, and non-residence within the Town of Cutler is not a rational basis to exclude a fisherman from obtaining a mooring in a navigable harbor or enjoying equal access to that afforded to residents.  (Pls. Obj. to Mot. to Dismiss at 11.)  Because it appears from the allegations that there is abundant space in Cutler Harbor for additional moorings and that the Town would not withhold a mooring permit from a resident lobster fisherman who applied for one, I consider this argument well put, although the Griffins' petition also indicates that some non-resident lobster fishermen do currently have moorings (presumably "grandfathered" rights) in Cutler Harbor.  In any event, "[u]nder the Equal Protection Clause, similarly situated entities must be accorded similar governmental treatment."  <u>Barrington Cove, LP v. R.I. Hous. & Mortgage Fin. Corp.</u>, 246 F.3d 1, 7 (1st Cir. 2001) (citing <u>City of Cleburne v. Cleburne</u>

Living Ctr., 473 U.S. 432, 439-40 (1985)).  Membership in a suspect category is not

required to state an equal protection claim; plaintiffs may also allege facts indicating that

they were selectively treated, compared with others similarly situated, based on the

absence of any "rational basis" for the selective treatment.  Village of Willowbrook v.

Olech, 528 U.S. 562, 564 (2000).  Because this case presents an as applied challenge to

the acts of the defendants and not merely a facial challenge to the Cutler Harbor

Ordinance, and because the allegations support an inference that economic protectionism

is the exclusive reason for the defendants' refusal to allow the Griffins' access to

moorings in Cutler Harbor, which reason could be illegitimate under the commerce

clause, I recommend that the Court not dismiss the equal protection aspect of the Griffins'

civil rights claims.

       *3.*     *Due Process*

      The defendants assert that the Griffins' due process theories are not viable because

the Griffins lack a cognizable property right in a mooring permit and because their

allegations do not portray conscience-shocking behavior.  (Mot. to Dismiss at 10-13.)

The Griffins respond that they have a cognizable property right in moorings because they

hold an "absolute entitlement" to them and because the defendants' withholding of the

permits is "arbitrary" and "conscience-shocking."  (Pls.' Obj. to Mot. to Dismiss at 17-

19.)

      I conclude that the procedural due process claim is not viable because, even if

there were a property right at stake, the mooring permit application process did not call

for any "pre-deprivation process" such as notice or an opportunity to be heard and this

Court's consideration of the Griffins state law Rule 80B appeal *is* the state law process

that the Griffins are presently entitled to.  See SFW Arecibo, Ltd. v. Rodriguez, 415 F.3d 135, ___, 2005 U.S. App. LEXIS 14219, *8-*12 (1st Cir. July 14, 2005) (discussing due process claims premised on alleged rights in permits and the implications of PFZ Props., Inc. v. Rodriguez, 928 F.2d 28 (1st Cir. 1991)).  I also conclude that the substantive due process claim is not viable.  Such a claim would require proof that the defendants exercised their statutory authority for purposes of oppression (rather than for the purpose of economic-protection that is alleged) or in a manner that shocks the conscience.  Id. at *12-14.  Even viewed in the light most favorable to the Griffins, their case simply does not involve oppressive or conscience-shocking behavior.  Moreover, the Griffins have not endeavored to articulate their claims as concerning any "fundamental" interest deserving special protection in light of our Nation's history and tradition, except insofar as their claims might implicate either the Commerce Clause or the Equal Protection Clause.  See Washington v. Glucksberg, 521 U.S. 702, 720 (1997) ("The Due Process Clause specially protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition.") (quotation marks and citation omitted); Albright v. Oliver, 510 U.S. 266, 271-72 (1994) (discussing the limited scope of substantive due process rights and expressing "reluctan[ce] to expand the concept"); City of Cuyahoga Falls v. Buckeye Cmty. Hope Found., 538 U.S. 188, 200-201 ("Those who claim 'arbitrary' deprivations of nonfundamental liberty interests must look to the Equal Protection Clause, and Graham v. Connor, 490 U.S. 386, 395 (1989), precludes the use of "substantive due process'" analysis when a more specific constitutional provision governs.") (Scalia, J., concurring).  Based on the foregoing, I recommend that the Court dismiss the due process claims set forth in the Griffins' civil rights counts.

4.     *Punitive Damages*

The parties agree that the Town of Cutler cannot be liable for punitive damages on the civil rights claims.  (Mot. to Dismiss at 13;  Pls.' Obj. to Mot. to Dismiss at 19.)

5.     *Qualified Immunity*

The Harbor Masters argue that they are entitled to qualified immunity on the civil rights claims.  (Mot. to Dismiss at 18.)  The Griffins do not mount a very persuasive opposition to this argument.  The sum and substance of their response is as follows:

> Based on the case law cited by Defendants and the conduct of the individuals, there is no available immunity for them.  The Harbor Masters knew or should have known that their actions were illegal in light of the Ordinance and the Act.

(Pls.' Obj. to Mot. to Dismiss at 19.)  The doctrine of qualified immunity is meant to shield state actors from the interference and disruption that litigation might pose to their performance of governmental duties and obligations, as well as to reduce the disincentive that the threat of litigation might otherwise create in the minds of people considering a career in public service.  Burke v. Town of Walpole, 405 F.3d 66, 76-77 (1st Cir. 2005).  Thus, the judicially-created doctrine immunizes public officials from liability for alleged federal civil rights violations unless their conduct violates clearly established federal statutory or constitutional rights that a reasonable person in their position would be aware of.  Id.  The doctrine has been described as protecting "all but the plainly incompetent or those who knowingly violate the law."  Id. at 77 (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).  In furtherance of this objective, the question of whether a defendant is entitled to qualified immunity is supposed to be determined "at the earliest practicable stage" of litigation.  Id. (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)).  The test has three parts:

> (i)     whether the plaintiff's allegations, if true, establish a constitutional violation;
>
> (ii)    whether the constitutional right at issue was clearly established at the time of the putative violation; and
>
> (iii)   whether a reasonable officer, situated similarly to the defendant, would have understood the challenged act or omission to contravene the discerned constitutional right.

Limone v. Condon, 372 F.3d 39, 44 (1st Cir. 2004).  The Griffins' memorandum of law does not give thorough treatment to these factors, although it is clear that they bear the burden to do so.  On the other hand, the defendants' memorandum is quite terse in its treatment as well.  They recite the relevant standards (which the Griffins adopt by reference) and then merely assert that the Griffins "have failed to assert facts sufficient to meet these standards."  (Mot. to Dismiss at 19.)  In effect, the Harbor Masters merely posit in conclusory fashion that the allegations do not set forth a violation of clearly established law and the Griffins respond that they do.  Of course, I have already concluded that the civil rights claims in the third amended petition present equal protection and interstate commerce theories.  My understanding of the core civil rights claim asserted in the third amended petition is that it is derived from both the Equal Protection Clause and the Commerce Clause, working together.  In effect, the Griffins maintain that the only reason they are being denied moorings is that the defendants seek to protect their own, local commercial interests and that that reason is illegitimate in light of the restrictions imposed by the Commerce Clause.  I think that this theory of the case and the allegations supporting it describe a "knowing" violation of law because it has long been established that similarly situated individuals must be treated equally unless there exists a rational basis to treat them disparately.  In addition, the restrictions imposed

26

by the Commerce Clause on local economic protectionism are equally well established and, not unlike the standard applicable to the equal protection claim, commerce clause litigation has utilized a rather straight-forward balancing test since at least 1970, when the Supreme Court decided <u>Pike v. Bruce Church, Inc.</u>, 397 U.S. 137 (1970). If, as alleged, the Harbor Masters have acted as they have exclusively for the purpose of preserving local economic interest *at the expense of interstate commerce* and in violation of the equal protection clause, then clearly established constitutional rights would be violated and it would be within the ken of a reasonable Harbor Master that his conduct would infringe those rights.

**D.     State Law "Interference" Claim**

The individual defendants contend that they are immune to liability on a state law tort claim pursuant to the Maine Tort Claims Act. (Mot. to Dismiss at 14-16.) The Griffins respond that their state law claims (which now include an unfair trade practices claim) are being pursued against the individual defendants exclusively in their capacities as private citizens who have interfered with the Griffins' use of the Harbor. The question of whether the non-official acts of the individual defendants are sufficient to support these claims is not presented by the pending motion to dismiss. Accordingly, I recommend that the Court deny the motion to dismiss insofar as it challenges the Griffins' state law tort claims brought against individual defendants. The proposed third amended petition also contains a count seeking a declaratory judgment against the Town of Cutler regarding the efficacy of the 2005 Harbor Ordinance under the Maine and federal constitutions. Quite understandably the defendants' motion does not address this count because an analogous count did not exist in the second amended petition. Based upon my

independent review I see no reason to dismiss this count at this time for failure to state a claim.

**C**ONCLUSION

For the reasons set forth above, I **GRANT** the third motion to amend (Docket No. 15) and **RECOMMEND** that the Court **GRANT IN PART** the motion to dismiss (Docket No. 4), by dismissing:

    (a)       the due process theories that may have been gleaned from the second amended petition and that are now more clearly expressed as a part of counts IV and V of the third amended petition;

    (b)       any claim for punitive damages against the Town of Cutler; and

    (c)       any state tort claims against the Town or the Harbor Masters for their official acts.

In all other respects, I **RECOMMEND** that the Court **DENY** the motion to dismiss.

NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

Dated:  August 18, 2005           /s/ Margaret J. Kravchuk
                                    U.S. Magistrate Judge